**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-61423-CIV-ALTMAN/Hunt**

**JAMES VERSFELT**,

     *Plaintiff*,

*v.*

**SANZA FOOD SERVICE, LLC**,

     *Defendant*.

_____/

## <u>ORDER</u>

James Versfelt was hired as an executive chef at the Florida Panthers' arena. Seven months later, he was fired. Why? Well, in his short tenure, Versfelt upset the team-owner's wife by allowing ingredients to run low, leading her to tell him: "[t]his just isn't working out." The team was also losing a lot, and Versfelt "[o]ne hundred percent" agreed that his "higher salary," along with the organization's thin "margins," had something to do with his termination. On top of that, he upset a "very important" stakeholder during a program for guest chefs. And, by the end of his tenure, no fewer than ten employees (all working under Versfelt in the kitchen) sent upper-management a declaration—a list of grievances, really—asserting that "Chef James has been rude, disrespectful, [and] spoken foul to others in a rude or degrading manner." Those ten employees then gave management the following ultimatum: take "action[]" against Versfelt or we won't "come back to work." After all this, Versfelt's employer, Sanza Food Service LLC (our Defendant), fired him. And who could blame them? Unhappy with his termination, Versfelt now claims that he was actually fired because of his age. Since no reasonable jury would agree with him, we **GRANT** Sanza's motion for summary judgment.

THE FACTS[1]

The Florida Panthers worked with a third-party vendor, Centerplate Inc., for twenty-plus years to serve food and beverages at the team's arena. *See* Depo. of James Versfelt [ECF No. 31-1] ("Versfelt Depo.") at 64:6–8. Eventually, the franchise's owner and his wife—Vincent and Teresa Viola—decided to bring those operations in-house. *Id.* at 96:16–22 (explaining that the Violas "decided . . . [w]e're going to do it ourselves"). And so, the Violas formed Sanza Services LLC. *Id.* at 95:13–18 (noting that "the entire Sanza creation" was "under the direction of ownership"); *see also* Depo. of Joe Bellanti [ECF No. 31-2] ("Bellanti Depo.") ("Sanza was created by the Viola's[.]"). By August 2018, Sanza had taken over food-and-beverage operations at the arena. *See* Defendant's Statement of Material Facts [ECF No. 30] ("Defendant's SOF") ¶ 1; Plaintiff's Statement of Material Facts [ECF No. 39] ("Plaintiff's SOF") ¶ 1 ("Undisputed.").

In September 2018, about a month after Sanza took over the arena's food-and-beverage operations, the company began interviewing James Versfelt to serve as executive chef for the whole arena. *See* Joint Statement of Undisputed Facts [ECF No. 32] ("JSOF") ¶ 2. Sean McCaffrey (the Panthers' chief operating officer) "interviewed [Versfelt] in person, multiple times, and participated in a tasting as part of the interview process." Plaintiff's SOF ¶ 4. At the time, Versfelt was 53 years old. Defendant's SOF ¶ 6; Plaintiff's SOF ¶ 6 ("Undisputed."). And, according to Versfelt, his age was obvious from his resumé. As Versfelt explained, "McCaffrey . . . reviewed [Versfelt's] resume with him *ad nauseum* during multiple interviews," and his resumé is "comprised of his graduation from his

---

[1] "The facts are described in the light most favorable to [the plaintiff]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant].").

2

undergraduate degree and dates of prior employment which are clear indicators of [Versfelt's] age." Plaintiff's SOF ¶ 7. Seemingly content to hire a 53-year-old chef, McCaffrey hired him anyway. *See* Defendant's SOF ¶ 5; Plaintiff's SOF ¶ 5 ("Undisputed.").

Two sous chefs who worked under Versfelt—Joe Bellanti and Everton Dussard—had been chefs at the Panthers' arena before Versfelt was hired. *See* Defendant's SOF ¶¶ 10, 13, 17; Plaintiff's SOF ¶¶ 10, 13, 17 ("Undisputed."). Bellanti, who was a *few years younger* than Versfelt, had "wanted" the executive chef job, but he "didn't get it." Versfelt Depo. at 168:8–169:4. Versfelt got the job, in other words, over Bellanti—the *younger* applicant. *See* Bellanti Depo. at 17:8–19 (testifying that he "applied for the position" but that "Mr. Versfelt was chosen for the position over [him]"). On the other end of the spectrum, Dussard is more than *five years older* than Versfelt. *See* Defendant's SOF ¶ 14; Plaintiff's SOF ¶ 14 ("Undisputed."). And, before hiring Versfelt, McCaffrey had urged Dussard (the older man) to apply for the executive chef position—an offer Dussard declined. *See* Defendant's SOF ¶¶ 15–16; Plaintiff's SOF ¶¶ 15–16 ("Undisputed."). So far, Versfelt's claims of age discrimination ring rather hollow.

Versfelt started working at the arena in October 2018, *see* JSOF ¶ 4, and things quickly devolved from there. For starters, Sanza's vice president of human resources, Lane Miller, "began receiving complaints from Sanza staff regarding Versfelt's demeanor relatively quickly after he was hired." Decl. of Lane Miller [ECF No. 31-6] ("Miller Decl.") ¶¶ 3–5, 10; *see also* Depo. of Sean McCaffrey [ECF No. 31-4] ("McCaffrey Depo.") at 46:20–24 ("[T]here was a lot of chefs not happy with the work environment[.]"). In fact, three months into Versfelt's tenure, two employees—Bellanti (one of the sous chefs) and Rosanna Russo (a concessions manager)—visited Miller to discuss their

concerns about Versfelt. *See* Miller Decl. ¶ 14. Miller's notes from that meeting—which were filed in

this case—reflect rather poorly on Versfelt's conduct as executive chef:

> Joe Bellanti and Rosanna Russo came to my office and asked to speak to me about
> Chef James. They proceeded to tell me that Chef is creating significant morale
> problems among the culinary staff. They described Chef James as a bully. He said he
> is abusive to his staff, condescending in his tone. He stays in his office with the door
> closed and does not routinely interact with the staff. They expressed concern that the
> quality of the food has suffered and that he doesn't have any regard for staff or
> customer input. Joe and Rosanna were quite upset but concerned that their input
> would get back to Chef and that he would retaliate against them. I tried to assure them
> that we would handle the matter and that any form of retaliation would not be
> tolerated.

Memorandum from Lane Miller (Jan. 18, 2019) [ECF No. 31-6] at 17.[2] Miller also testified that she

"had been advised of [Versfelt's] treatment towards staff" by others, including Leslie Hunt (an office

manager) and Dussard (one of the sous chefs). Depo. of Lane Miller [ECF No. 31-5] ("Miller Depo.")

at 13:4–20. For his part, McCaffrey testified that Versfelt was "arrogant," "abrasive," and

"condescending," and that Versfelt "showed a basic lack of respect" towards his chefs. *See* McCaffrey

Depo. at 44:24–25, 46:1–7.

External stakeholders also complained about Versfelt. McCaffrey, for example, "told [Versfelt]

prior" to one of the Panthers' guest-chef programs that YOLO—a participant in the program—"was

---

[2] Looking to drum up a genuine issue of fact, Versfelt claims that he "was never made aware of any
employee complaints" and that he "was never subjected to disciplinary action in connection with any
employee complaints." Plaintiff's SOF ¶ 29. But (it goes without saying) whether Versfelt was *told*
about these complaints (or *punished* for them) has very little to do with whether those complaints were
*actually* made. And, to his credit, Versfelt never suggests that they weren't—at least not directly.
Versfelt, of course, had more than nine months of discovery to undermine Sanza's evidence of these
complaints—whether through depositions, interrogatories, or requests for production—but he failed
to do so. And, now, it's way too late. *See Shenzhen Kinwong Elec. Co. v. Kukreja*, --- F. Supp. 3d ---, 2021
WL 5834244, at *19 (S.D. Fla. Dec. 9, 2021) (Altman, J.) ("To survive summary judgment, '[t]he non-
movant . . . must do more than simply show that there is some metaphysical doubt as to the material
facts. It must come forward with some affirmative evidence to support its claim.'" (quoting *A&E
Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1342 (S.D. Fla. 2021) (Altman, J.))).

very important because they had some level of relationship with ownership." Versfelt Depo. at 245:8–15. According to Versfelt, things didn't go well. Versfelt explained that the chefs YOLO sent to help with the guest-chef program "took exception" to his decision to pawn them off on his sous chefs rather than "go[ing] along with them and spend[ing] all day with them." *Id.* at 246:2–11. At some point, Versfelt decided to "change[] their menu" when he determined that "the quality of one of the dishes . . . didn't seem the right mix to the menu [he] already had planned." *Id.* at 246:12–23. "So they were upset with their experience." *Id.* at 246:22–23. Unfortunately for Versfelt, his interactions with YOLO didn't go unnoticed. YOLO sent a long email to McCaffrey and others complaining about the guest-chef program. Here's a portion of that message (which, again, reflects poorly on Versfelt for reasons having nothing to do with age):

> I wanted to review with your team some hiccups we ran into in hopes that they can be avoided for our participation with YOLO in a few weeks. Our main issues came in the food preparation. My team was working with Chef James Versfelt and the main reason I bring them up is because Township [(the guest chef affiliated with YOLO)] was not represented very well. . . .
>
> When the chef from Township arrived the product was not available and when the delivery was said to arrive, it was sent to two different kitchens so my team had to spend 2 hours assembling it. We were told that the team at the arena would prep the food, but there were no staff available to do that prep. From my understanding there was no one assigned to make our dishes and everyone had their own tasks they needed to complete. Our goal was to have Township's Chef there to make sure the team at the arena produced the items to our spec. When they spoke with Chef James he was told that they had to produce 4 items at 800 each, but in the initial correspondence it was 6 items and 250 each. This is a pretty big change to find out the day before. Also, there was some deviation from the ingredients list that we provide, and they also deviated between the two kitchens that were preparing food for the different areas. (IE Portioned Chicken in Corona Club vs Large Random Chicken in Club Lexus). We were also instructed to prep items over 6 hours prior to the event and place in heated boxes. This is not only a health hazard, but some of our items were served cold.

Letter from YOLO to Sanza (Jan. 11, 2019) [ECF No. 31-6] at 13. According to Versfelt, McCaffrey was "pretty upset" about the situation "because that client potentially has future business relations

with the team and/or ownership so I guess he was probably not happy with the fact that it might get

back to Mr. Viola or something and make him look bad." Versfelt Depo. at 247:1–13.[3]

But that's just scratching the surface. During his deposition, Versfelt also conceded that

McCaffrey had approached him about his failure to follow instructions. In particular, McCaffrey spoke

to Versfelt about what McCaffrey "felt was a failure to [follow directions] when it came to a sponsor

in the building, Hoffman's ice cream." *Id.* at 235:12–16. McCaffrey had previously told Versfelt that

the owners of Hoffman's ice cream were "good friends of the" Violas (the Panthers' owners) and that

he wanted Hoffman's ice cream to be "featured in our clubs" over the "local vendor" Versfelt had

been using. *Id.* at 235:18–236:10. "And then, at some point [McCaffrey] brought up, well, you've never

---

[3]     Versfelt claims, in a declaration he filed alongside his Response, that "[o]ne external stakeholder purportedly complained about how unhappy they were with treatment, which Defendant baselessly attributed to me, but with no reference to me as the source of the complaint whatsoever." Versfelt Decl. ¶ 32. That's ridiculous. As we can see from Versfelt's own deposition testimony, Versfelt repeatedly conceded that YOLO was unhappy with the way *he* handled the guest-chef program. *See, e.g.*, Versfelt Depo. at 246:1–23 ("I delegated them to my sous chef. . . and, I guess, they took exception to that . . . . I also changed their menu. . . . They took exception to that as well."). And, in the letter, YOLO *specifically* complained about Versfelt. *See, e.g.*, Letter from YOLO to Sanza (Jan. 11, 2019) ("When my chef spoke with Chef James he was told that they had to produce 4 items at 800 each, but in the initial correspondence it was 6 items and 250 each. This is a pretty big change to find out the day before."); *id.* ("Our main issues came in the food preparation. My team was working with Chef James Versfelt[.]").

For two reasons, then, Versfelt's declaration fails to create a genuine issue of material fact on this issue. *First*, he's failed to explain the unmistakable contradiction between what he said in his deposition—which was corroborated by what YOLO itself said in its letter—and what he, trying to salvage his case at summary judgment, wrote down in his declaration. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). *Second*, because Versfelt's statement from his declaration—that Sanza "baselessly attributed" YOLO's complaint to him—is blatantly contradicted by the letter itself, it cannot create a genuine issue of material fact. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

-- why do we still have this ice cream? You've never put Hoffman ice cream in." *Id.* at 236:20–22.

"[H]e seemed a little ticked off by that." *Id.* at 237:2.

Versfelt also had an icy relationship with Ms. Viola. Versfelt explained that "[i]ce cream . . .

would become a sticking point because, apparently, Ms. Viola disliked certain flavors that the guests

really liked a lot, like mango. Apparently she hates mangos." *Id.* at 236:11–20. Versfelt testified that he

"didn't get the information that she really disliked mango for a while . . . [s]o there was some

perception, oh, I wasn't responding to her dislikes or vocalized requests." *Id.* Indeed, Versfelt became

"suspicious" about his job security because of his "relation[ship] with the owner's wife." *Id.* at 193:12–

20. He "start[ed] to hear comments that she -- about comments that people were saying that she had

said about [his] food or the food operations." *Id.* On one occasion, in fact, after Ms. Viola told Versfelt

that "some article of food . . . was either low or hadn't been swapped out," it became clear to Versfelt

that she wasn't happy with him at all. *Id.* at 194:18–20. As Versfelt recalled the incident: "And I

remember very specifically her saying, well, you know, this just isn't working out. And I'm like,

whatever do [you] mean, ma'am? This whole club and you and what you're doing there. This just isn't

working out." *Id.* at 195:7–11. To be clear, Versfelt has never alleged that Ms. Viola was upset with

him—or that his relationship with her wasn't "working out"—because of his age.

But that's not nearly the whole of it. On April 6, 2019, seven months into Versfelt's time at

Sanza, ten or so staff members wrote a letter—with the ominous subject line: "seeking termination of

Chef James"—to "Florida Panthers Human Resources/Vincent Viola." *See* Letter (Apr. 6, 2019) [ECF

No. 31-6] (the "Staff Letter") at 19; *see also* Plaintiff's SOF ¶ 41 ("Only some of Defendant's staff (a

total of ten) participated in signing the letter calling for Plaintiff's termination ultimatum." (cleaned

up)).[4] The men and women who signed the letter said they were "all willingly signing it due to past unpleasant experiences with him." *See* Staff Letter. They also averred that "Chef James has been rude, disrespectful, [and] spoken foul to others in a rude or degrading manner." *Id.* "We work in such a poor environment and unprofessional atmosphere while he is around." *Id.* The employees concluded with an unambiguous ultimatum: "[w]e as a team have decided," they wrote, "to wait and see if our requirements are met first before we decide to come back to work." *Id.*

Shortly after receiving this (no-doubt disconcerting) letter, McCaffrey made the decision to fire Versfelt. *See* Defendant's SOF ¶ 54; Plaintiff's SOF ¶ 54 (not disputing this point); *see also* McCaffrey Depo. at 66:2–5 (testifying that he was the "sole deciding person that made the decision to terminate Mr. Versfelt"). Before making that decision, McCaffrey spoke with at least seven employees about Versfelt. *See* McCaffrey Depo. at 40:13–16 ("Q. What individuals did you speak with? A. Chef Joe Bellanti, Everton Dus[s]ard, Alvin Rose, Alvin Gale, Shane Prue, Jarrett Seldin, Maria . .

---

[4] Since the letter—as we're about to see—has absolutely nothing to do with Versfelt's age (and everything to do with his misfeasance on the job), it constitutes a devastating assault on the merits of his lawsuit. Recognizing this, Versfelt tries to undermine the letter in three ways—all unconvincing. *First*, he claims that, "[u]pon information and belief, some of the signatures thereon were procured through coercion, duress, and fear of retaliation by Defendant or its employees." Versfelt Decl. ¶ 50. But it's settled law that "statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). *Second*, Versfelt contends that "[n]o purported dissatisfaction from Plaintiff's staff or the issues cited were ever communicated to him . . . prior to his termination" and that Sanza "did not take disciplinary action against [him] conveniently until his unlawful termination." Plaintiff's SOF ¶ 41. But there's no law that required Sanza, after receiving a letter like this one, to warn Versfelt (or discipline him) before firing him—and Versfelt wisely never suggests that there is. *Third*, Versfelt argues that "the letter indirectly complains about [his] 'experienced' approach to handling his subordinates which implicates [his] age." *Id.* No it doesn't. There's absolutely nothing in the letter about experience or age or anything else that could be plausibly construed as a comment on his age. The fact is that a company isn't required to employ someone who has an "adversarial management style and poor relationships with . . . employees and customers." *Vahey v. Philips Elecs. N. Am. Corp.*, 461 F. App'x 873, 875 (11th Cir. 2012). A young person, after all, can fall short as a leader just as much as an older person.

. .”). And, based on "a variety of data points along the way," McCaffrey concluded that Versfelt was missing "leadership" skills, that he exhibited "a lack of respect to other people as human beings," that he failed to "handl[e] stakeholders" properly, and that he refused to "listen[] to feedback." *Id.* at 14:22–24, 32:7–16, 34:15–19, 47:17–48:4, 48:13–17.

On April 24, 2019—roughly two weeks after they received the employees' letter and within seven months of hiring Versfelt—Sean McCaffrey and Lane Miller met with their executive chef and terminated his employment. *See* Defendant's SOF ¶ 55; Plaintiff's SOF ¶ 55 ("Undisputed."). As Versfelt recounted at his deposition, his termination meeting went like this:

> Q. Can you tell me what was said at the termination meeting?
>
> A. Basically, to my recollection, she started -- they greeted or I greeted them and asked what was going on or what was up. What was the meeting for. And then it seemed like she was kind of reading from a prepared statement or document and just said essentially, you know, management has lost faith in your ability to, you know, operate here as executive chef. Something to that degree. You've lost the -- I don't know what term they used. Not allegiance but sort of the confidence of the staff and, you know, we're going to, you know, terminate your position here.
>
> And then I asked, well, what do you mean exactly, the staff has lost my confidence? What are you talking about? And they said, well, the staff sent a letter to us signed by many people saying that they don't like how you talk to them and they don't like how you manage them and that they don't want to work with you and if we don't get rid of you, then they're all going to quit. Something to that degree. I said, well, that's a surprise to me. I haven't heard anything about that. I'd sure like to dive into investigating that to see what that's all about because I don't know of anything that they could be referring to.
>
> And, basically, I think Sean just reiterated essentially that context and then, you know, essentially cut off conversation about it. It wasn't going to become a discussion. And just made it clear that their minds were made up and I was terminated forthwith and that I was to, you know, sign a document and then immediately be escorted from the building by security. They had security waiting outside the door of the office. . . .
>
> Q. What you just explained, that they said that they lost faith in your ability, lost confidence of staff and you were being terminated, who said that? Was it Lane or was it Sean?

A. Lane said it first in a prepared statement kind of way. Then I sort of quizzed -- quizzed into it and then Sean reiterated it. The staff has lost -- we have lost confidence in you because you have lost the confidence of the staff. Something, you know, close to that. Due to this letter that we received. They wouldn't show me the letter. They wouldn't tell me when they got the letter or anything like that. So that was that. That was the first I ever heard of the letter was at that meeting that morning.

Q. Was anything else said?

A. Other than I think maybe a brief statement from Lane, you know, we'll be sending you any necessary documents for COBRA coverage, that kind of a thing. And I acknowledged it and I'm pretty sure I signed some kind of a document acknowledging that. Or maybe I didn't, actually. I might have just said I'm not going to sign anything right now and then we went up to my office.

Q. Anything else that was said?

A. Not that I can recall at this point after two years.

Versfelt Depo. at 178:10–181:20. Once Versfelt finished giving this (very detailed) account, Sanza's counsel then asked him—pointblank—whether his age had come up at all during that termination meeting:

Q. Did [McCaffrey] or [Miller] mention your age at your termination meeting?

A. I don't recall.

Q. Did they mention anything that related to your age?

A. The, you know, experience might have been mentioned. I was in a bit of a surprise there so, again, I don't know -- I can't remember specifically[.]

*Id.* at 186:25–187:8 (cleaned up).

In the declaration he appended to his summary-judgment Response, however, Versfelt appeared to walk back this version of events. Specifically, in three different places in that declaration, Versfelt seemed to suggest—for the first time—that McCaffrey and Miller *had* mentioned his age during that meeting. Here are the three sentences we're talking about: (1) "I was terminated by

Defendant, specifically, McCaffrey and Miller, by vaguely alleging that Defendant management lost faith in my abilities due to my age"; (2) "If not used verbatim, McCaffrey and Miller indirectly referenced by identifying him as too 'experienced,' 'old fashioned' (or 'too old) for the position"; and (3) "On April 24, 2019, McCaffrey and Miller met with me and informed me of my unlawful termination for no cogent reason other than Defendant lost faith in my abilities as a result of my age." Versfelt Decl. ¶¶ 62, 63, 83 (errors in original).

Puzzled by these allegations—which directly contradicted Versfelt's clear deposition testimony—we called the parties in for a status conference and asked Versfelt's lawyer to explain the striking discrepancy. *See* Minutes Entry [ECF No. 62]. In response, Versfelt's counsel clarified that these three allegations simply reflected Versfelt's "*belief* [that] those are the reasons that he's being terminated." 2/1/22 Hr'g Tr. at 9:5–8 (emphasis added). Versfelt's lawyer added that the sort of language he was describing in the declaration—"experienced," "old fashioned," "too old," "age," and so on—were "not used" in "the termination meeting." *Id.* at 9:15–24 ("[D]uring . . . this termination meeting, no, Judge, I want to make that clear. They -- it is not the plaintiff's position that the defendant walked into the meeting and told them you're too old, experienced, old-fashioned, and you're being terminated because of that. Absolutely not."). In other words, Versfelt only "supposed" that age played a role in his termination—even though nothing that was said at the meeting suggested as much. *Id.* at 10:1–5.

In any event, once Versfelt (age 54) left, Bellanti (age 51) and Dussard (age 61) took over his duties as executive chef. *See* Bellanti Depo. at 38:11–14 ("Q. Is there anyone else in an equivalent or like position as to executive chef as Mr. Versfelt was in? A. The two people that would probably be closest to him would [be] me, [and] Everton Dussard."); Decl. of Everton Dussard [ECF No. 31-7]

("Dussard Decl.") ¶ 18 ("After Chef Versfelt was terminated, my colleague, Joseph Bellanti, and I took over Chef Versfelt's duties."). And, at his deposition, Versfelt agreed that Bellanti and Dussard were likely sharing the role of executive chef:

> Q. Do you have any reason to believe that Joe Bellanti and Everton Dussard are not sharing in taking over your duties?

> A. I don't have any reason to not believe that. As I said before, I'm sure Everton is helping Joe with that task, and how it may or may not have been divvied up between them or to what level and/or regard that's occurring, I have no knowledge.

Versfelt Depo. at 212:20–213:2; *see also id.* at 205:12–18 ("I don't know if [Bellanti] took over all of it or how that worked out and I don't know any particularities[.]").[5]

Here's one more important detail: Of the 54 people who reported to Versfelt at the time of his termination, 16 were under the age of forty, 18 were between the ages of forty and fifty-three, 3 were fifty-four (the same age as Versfelt), and 17 *were older than Versfelt*. Defendant's SOF ¶¶ 77–78; Plaintiff's SOF ¶¶ 77–78 ("Undisputed."). Versfelt's allegations of age discrimination are, in short, hard to square with reality.

So, why was Versfelt terminated? That's what this case is all about. Versfelt himself offered a few theories at his deposition. *First*, one "factor" Versfelt pointed to was his "relation[ship] with the owner's wife." Versfelt Depo. at 193:12–13. He explained that, after his quarrel with Ms. Viola, "I remember, you know, being pretty -- like, that's not a good thing to happen within that building. She's had people fired before, I had heard, for other types of things that displeased her." *Id.* at 195:17–22.

---

[5] In opposing summary judgment, Versfelt volte-faced on this issue, too—claiming (again, in that oft-cited declaration) that "Bellanti . . . handles all job responsibilities and duties required by the Executive Chef." Versfelt Decl. ¶¶ 67–69. More on this transparent attempt to manufacture a genuine dispute of fact below.

*Second*, Versfelt testified that it's "[o]ne hundred percent" possible that his "higher salary" and "the financials of Sanza might have had something to do for the reason" he was let go. *Id.* at 203:10–24.

Despite acknowledging these (quite plausible) alternative scenarios, Versfelt felt compelled to file this lawsuit, in which he claims that Sanza fired him because of his age. *See* Am. Compl. [ECF No. 1-1]. His theory of the case is based—almost exclusively—on comments co-workers made while he worked at the company. Let's start with McCaffrey. Versfelt testified that McCaffrey made comments related to Versfelt's age "[a] couple times, probably," *see* Versfelt Depo. at 88:24–89:3—but only "in a flippant sort of humorful way, I guess," *id.* at 91:4–5. Although Versfelt couldn't recall a specific example, he speculated that the comments might've sounded something like this:

> Well, it could have -- it would have been something, you know, when I was relaying information or having a conversation in his office prior to a meeting, after a meeting saying, you know, I ran into this problem with a staff member or I ran into this roadblock within the operation or I don't have this tool or I don't have this ability or what have you -- something that I'm used to from the past and he could be, oh, well, you're old-fashioned, maybe, quote/unquote with the fingers or just sort of with the tone, you know, when people will speak with a bit of hyperbole.

*Id.* at 91:18–92:4. McCaffrey also offered a comment about (warning: the following is not a joke) Versfelt's mustache. *Id.* at 92:7–94:18. Before "No Shave November," Versfelt had "shaved clean off, including [his] mustache"; seeing this, McCaffrey said: "[O]h, I really liked the mustache before. You're going to grow it back, right, kind of thing, you know." *Id.* at 92:24, 93:9–10. In other words (Versfelt surmised), although McCaffrey thought Versfelt looked more "youthful" without the mustache, he nevertheless "preferred the mustache [on Versfelt]." *Id.* at 93:16–25.[6] The *only* other things McCaffrey

---

[6] Counter-intuitively, in his declaration, Versfelt (without explanation) said the complete opposite: that "McCaffrey told me that I looked older without a mustache at work." Versfelt Decl. ¶ 78. In any event, as we'll see, whether McCaffrey said Versfelt looked older *or* younger with a mustache is really neither here nor there.

*might* have said had to do with Versfelt being "experienced" or "old fashioned," Defendant's SOF ¶ 68; Plaintiff's SOF ¶ 68 (disputing other points)—not nearly the same thing as "old."[7]

Some of the people who worked under Versfelt served up similar remarks. *See* Plaintiff's SOF ¶ 64. For example, Versfelt testified that a few of his sous chefs, including Bellanti and Alvin Rose, "at times [had] a running joke a bit at my -- not really at my expense but, I guess, about me, towards me, from, you know, the sous chefs at times . . . [s]ort of joking about me being old or dinosaur, that kind of a thing, but I can't specifically remember the details of it." Versfelt Depo. at 36:13–37:19. He also said that "either a few hourly staff definitely, probably, threw it out there, and the sous chefs" called him (here it is again) old-fashioned. *Id.* at 49:10–18. Versfelt "definitely recall[ed] the term experienced used many times." *Id.* at 49:7–8.[8] And people often commented on his (shaved) mustache: "[D]efinitely many people were like, oh, my gosh, you look so youthful now, et cetera. And I'm like,

---

[7] Versfelt couldn't "recall" whether McCaffrey ever called him a dinosaur. *Id.* at 183:18–184:1. That's not evidence of anything.

[8] In his statement of facts (again, written by the lawyer), Versfelt suggests that Adam Fullerton (the general manager) was among the people who "made several discriminatory comments and remarks to [him] based on his age." Plaintiff's SOF ¶ 64. In his deposition, though, Versfelt put this notion to bed:

> Like I said in the beginning during the mustache -- that day because we were having a meeting it had to do with that. So there could have been a comment there but, no, not -- Adam always -- you know, was a personable guy. Pretty circumspect in terms of how he spoke about things. So I don't recall specifically any -- he *might* have made reference to my *experience* level at some point either in the interview process or soon after in the beginning[.]

Versfelt Depo. at 182:7–9 (emphases added). Again, we won't allow Versfelt's lawyer to fill in the holes Versfelt himself dug in the evidence. Either way, Fullerton left the company shortly after Versfelt was hired, and there's no claim (nor could there be) that he had anything to do with Versfelt's termination. *Id.* at 84:1.

what do you mean? Did I look old before? And there might have been a response, oh, well, yeah. Well, no, but you know what I'm saying. Those types of things -- comments." *Id.* at 93:2–7.

Versfelt filed this case in state court, and Sanza removed it here. *See* Notice of Removal [ECF No. 1]. In his amended complaint, Versfelt asserts two counts of age discrimination against his former employer: one under the Age Discrimination in Employment Act (the "ADEA") and the second under the Florida Civil Rights Act (the "FCRA"). *See generally* Am. Compl. Sanza has now moved for summary judgment on both counts. *See* MSJ [ECF No. 29]. And that motion is fully briefed. *See* Response [ECF No. 38]; Reply [ECF No. 49].

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material

fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

### ANALYSIS

Age discrimination claims under the ADEA and FCRA "are analyzed under the same frameworks." *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014). "The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that

employee's age." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1331 (11th Cir. 2013). A plaintiff may "establish a claim of illegal age discrimination through either direct evidence or circumstantial evidence." *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (quoting *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008)). Unfortunately for Versfelt, no reasonable jury could find—through direct or circumstantial evidence—that he was terminated *because of* his age. We take the two methods in turn.

### A.  Direct Evidence

"Direct evidence is evidence which itself proves the existence of discrimination and does not require inference or interpretation." *Schweers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) (cleaned up); *see also Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (same). "[T]he evidence must indicate that the complained-of employment decision was *motivated* by the decision-maker's ageism." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358–59 (11th Cir. 1999). "As a result, 'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination." *Id.* at 1359 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990)).

Since direct evidence of discrimination "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption," any "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 787 (11th Cir. 2018) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). An example of "direct evidence would be a management memorandum saying, 'Fire [Versfelt]—he is too old.'" *Damon*, 196 F.3d at 1359 (quoting *Earley*, 907 F.2d at 1082).

Versfelt has fallen far short of this rigorous standard. For starters, all of the remarks by non-decisionmakers are entirely irrelevant. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (explaining that "statements by nondecisionmakers" are not direct evidence of discrimination); *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 872 (11th Cir. 2011) ("The other discriminatory remarks identified by [the plaintiff] do not constitute direct evidence because they were not made by the decision makers."); *Morrison v. City of Bainbridge*, 432 F. App'x 877, 880 (11th Cir. 2011) (noting that "remarks by non-decisionmakers . . . are not direct evidence" of discrimination). It's undisputed that McCaffrey alone made the decision to fire Versfelt. *See* Defendant's SOF ¶¶ 54, 59; Plaintiff's SOF ¶¶ 54, 59 (not disputing this point). As a result, Versfelt's suspicions about his other co-workers (like Bellanti, Rose, Fullerton, and others working under him) are beside the point and cannot supply direct evidence of discrimination.

And *all* of the comments—by the decisionmaker (McCaffrey) and the non-decisionmakers (everyone else) alike—fail for two basic reasons. *First*, Versfelt has done nothing to show that any of the remarks were "made in the context of [his] termination." *Addison v. Ingles Markets, Inc.*, 515 F. App'x 840, 842 (11th Cir. 2013). So, for example, Versfelt couldn't "remember" whether McCaffrey had said *anything* about his age at the termination meeting. Versfelt Depo. at 186:25–187:8. Indeed, Sanza's counsel specifically asked him to recount for her everything that he could remember about that meeting. *Id.* at 178:10–11; 181:9–20. In response—and under oath—Versfelt set out the whole long litany of comments, sentiments, and observations that, in retrospect, comprise the sum and substance of what he now remembers about that fateful and (one would imagine) unforgettable event. *Id.* at 178:12–181:20. After he'd exhausted his supply of memories, though, Sanza's counsel asked him one more time—she gave him one last chance to tell her—whether "*anything else*" was said at that meeting.

18

*Id.* at 181:9, 18 (emphasis added). His answer tells us everything we need to know: "Not that I can recall at this point after two years." *Id.* at 181:18–20. At a subsequent hearing, in fact, Versfelt's counsel (candidly) affirmed that there's no evidence that any discriminatory remarks were made at that meeting. 2/1/22 Hr'g Tr. at 8:19–9:24. And the same is true of the Staff Letter: the employees who signed that letter discussed Versfelt's "degrading" behavior; they even characterized him as "disrespectful"; but no one said *anything* about his age. *See generally* Staff Letter. Because Versfelt hasn't identified any "statements made during the decision-making process, the statements are not direct evidence of age discrimination." *Jones v. BE&K Eng'g Co.*, 146 F. App'x 356, 359 (11th Cir. 2005); *see also Kilgore v. Trussville Dev., LLC*, 646 F. App'x 765, 773 n.4 (11th Cir. 2016) ("[T]he discriminatory remarks were not made in the context of [the plaintiff's] termination, so they were not direct evidence of discrimination.").

*Second*, even if Versfelt *had* linked the complained-of statements to the decision-making process, none of them resemble the sort of "blatant remarks, whose intent could be nothing other than to discriminate on the basis of age." *Hicks-Washington v. Hous. Auth. of City of Fort Lauderdale*, 803 F. App'x 295, 302 (11th Cir. 2020) (quoting *Van Voorhis*, 512 F.3d at 1300). In his declaration, Versfelt pointed to "comments and remarks . . . based on [his] age, including but not limited to: 'old' or 'older,' 'dinosaur,' 'old fashioned,' 'too experienced,' 'looked older without facial hair,' and 'over the hill.'" Versfelt Decl. ¶ 71 (cleaned up).[9] But none of these remarks show—without inference or presumption—that Versfelt's termination "was *motivated* by the decision-maker's ageism." *Damon*, 196

---

[9] We'd note (again) that this list strays in salient ways from what Versfelt said at his deposition, where he testified, quite clearly: "I don't know if I can recall over the hill being used." Versfelt Depo. at 49:4–5. And, while his declaration alleges that people said he "looked older without facial hair," he testified at his deposition that people agreed he "look[ed] so youthful" without it. *Id.* at 93:2–7. No matter. We'll take Versfelt's list from his declaration as true—and find it *still* wanting.

F.3d at 1359. A person can be called a "dinosaur" or "old" and still be fired for abusing his co-workers, for having too high a salary, or for any number of other things having nothing to do with age. Indeed, many of the adjectives Versfelt relies on—"old fashioned," for instance, or "too experienced"—can easily apply to someone *regardless* of his or her age. There is, in sum, no smoking gun—no "Fire [Versfelt]—he is too old"—that could constitute direct evidence of age discrimination. *Earley*, 907 F.2d at 1082.

Courts in this Circuit regularly refuse to "give great weight . . . to language that is, at best, only circumstantial evidence" because, to do otherwise, would be to "blur[] the important distinction between circumstantial evidence and direct evidence for prima facie cases." *Jones*, 151 F.3d at 1323 n.11. Take the Eleventh Circuit's decision in *Damon*, for instance. In that case, the district manager said, "immediately after [the plaintiff's] termination," that "what the company needed was aggressive *young* men . . . to be promoted." 196 F.3d at 1359. Judge Marcus, writing for the court, concluded that, "[w]hile the statement was made right after [the plaintiff's] termination, and it was made by [the manager], the decision-maker, to [the plaintiff's] younger replacement, the comment does not amount to direct evidence of discrimination." *Id.* Why? Because the comment "requires us to *infer* that [the manager's] interest in promoting young men motivated his decision to terminate [the plaintiff]," *id.*— and inference is the tool of circumstantial, not direct, evidence.

Our facts, of course, are even clearer. There's *no* evidence that McCaffrey made *any* comments about *anyone's* age "immediately" before or after firing Versfelt. There's *no* evidence of remarks linking age to "promot[ions]." And there's *no* evidence that McCaffrey made ageist remarks to a "younger replacement." Instead, all we have are certain age-related quips (mainly from non-decisionmakers) that would require us, as in *Damon*, to *infer* that Versfelt was terminated because of his age. There is, then,

no direct evidence of discrimination here. *See also, e.g., Schweers*, 132 F. App'x at 324 (supervisor "having called [the plaintiff] an 'old man' . . . does not necessarily, or by implication, mean that [the supervisor] fired [the plaintiff] because of his age"—and so, "is not direct evidence" of discrimination); *Cardelle v. Miami Beach Fraternal Ord. of Police*, 593 F. App'x 898, 901 (11th Cir. 2014) (president's statement that a retirement plan was designed "to get older people out of [the department] to create more promotional opportunity" was "perhaps crass" but did "not meet our strict direct evidence standard"); *Morrison*, 432 F. App'x at 880 (supervisor's comment, months before the termination, that he was "going to get these old folks out of here and bring in some new blood" perhaps showed "animus" but did not "unambiguously suggest that [the plaintiff] was terminated because of her age").

*     *     *

Versfelt, in sum, has presented no direct evidence of discrimination, and no reasonable jury could find otherwise.

### B. Circumstantial Evidence

This Circuit "uses the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) . . . to evaluate ADEA claims that are based upon circumstantial evidence of discrimination." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). "*McDonnell Douglas* established a three-step process for analyzing discrimination claims." *Ehrhardt v. Haddad Rest. Grp., Inc.*, 443 F. App'x 452, 455 (11th Cir. 2011). *First*, the plaintiff "must . . . establish a prima facie case of discrimination." *Sims*, 704 F.3d at 1332. *Second*, the burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the challenged employment action." *Id. Third*, "[i]f the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that

the employer's stated reason is a pretext for discrimination." *Id.* at 1332. As we'll see, Versfelt's case

falters at each step.[10]

    1. *Prima Facie* Case

---

[10]    The parties agree that the *McDonnell Douglas* burden-shifting framework governs their dispute. *See* MSJ at 2 ("Where, as here, a plaintiff proffers no direct evidence of discrimination, the circumstantial evidence framework set forth in *McDonnell Douglas* . . . governs the evaluation of the claims."); Response at 7 ("When an ADEA claim is based upon circumstantial evidence, courts analyze the allocation of burdens and the presentation of proof under the framework articulated in *McDonnell Douglas*[.]" (cleaned up)).

    There are, it's true, *other* theories a plaintiff could rely on to establish a discrimination claim based on circumstantial evidence. Indeed, the Eleventh Circuit has been clear that "the *McDonnell Douglas* framework . . . is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case." *Sims*, 704 F.3d at 1333; *see also Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1387 (11th Cir. 1983) ("We therefore reaffirm that the *McDonnell Douglas* . . . test, while a viable one, is not the alpha and omega of possible tests in the age discrimination context." (cleaned up)).

    And it would make little sense to require an employee to prove discrimination solely through (1) direct evidence, which allows for no inferences (on the one hand), or (2) the *McDonnell Douglas* test, which requires, as we'll see, proof that the employee was replaced by a substantially younger worker (on the other). As Judge Tjoflat, writing by himself, observed: "it is both logically and practically possible for an employer to discriminate against a person on the basis of a protected personal characteristic despite the fact that the person is replaced by someone with the same characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1300 (11th Cir. 1999). To conclude that *McDonnell Douglas* is the alpha-and-omega of circumstantial-discrimination claims, then, would preclude employees from proving their case through *other* pieces of circumstantial evidence—a result that would turn *McDonnell Douglas* (which was intended "to make the plaintiff's task slightly easier") "on its head." *Id.* at 1301.

    In line with all this, the Eleventh Circuit has (time and again) recognized that a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (cleaned up).

    For two reasons, though, this discussion—though interesting—is academic here. *First*, Versfelt has relied *only* on the *McDonnell Douglas* framework in his papers. He, indeed, has *never* claimed—not once—that this case presents a "convincing mosaic" of discrimination. As a result, he's waived any such claim he might've had. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). *Second*, on this record, the evidence suggests that, even had Versfelt tried, there's simply no such mosaic to be found.

Versfelt has failed to make out a *prima facie* case of discrimination. To establish a *prima facie* case, a plaintiff must show: "(1) that he was a member of the protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person filled the position from which he was discharged; and (4) that he was qualified to do the job for which he was rejected." *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 656–57 (11th Cir. 1998) (quoting *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998)). In our case, only the third element—whether Versfelt was replaced by a substantially younger person—is in dispute.

But the evidence that Versfelt was replaced (in part) by a significantly *older* employee is simply overwhelming. There's no dispute that "Dussard is 61 years old, more than five years older than [Versfelt]." Defendant's SOF ¶ 14; Plaintiff's SOF ¶ 14 ("Undisputed."). And Bellanti and Dussard confirmed that they *both* took over Versfelt's job once he was terminated. *See* Bellanti Depo. at 38:11–14 ("Q. Is there anyone else in an equivalent or like position as to executive chef as Mr. Versfelt was in? A. The two people that would probably be closest to him would [be] me, [and] Everton Dussard."); Dussard Decl. ¶ 18 ("After Chef Versfelt was terminated, my colleague, Joseph Bellanti, and I took over Chef Versfelt's duties."). McCaffrey likewise testified that he's yet to hire a new executive chef and that, instead, "Joe Bellanti and Everton Dussard both are currently operating in terms of the two head chefs and Everton's been here forever and so has Joe and they are both -- they split responsibilities and take that on until we are comfortable in terms of selecting someone new." McCaffrey Depo. at 42:23–43:4. Even Versfelt admitted that Bellanti and Dussard were likely sharing the top job:

> Q. Do you have any reason to believe that Joe Bellanti and Everton Dussard are not sharing in taking over your duties?

A. I don't have any reason to not believe that. As I said before, I'm sure Everton is helping Joe with that task, and how it may or may not have been divvied up between them or to what level and/or regard that's occurring, I have no knowledge.

Versfelt Depo. at 212:20–213:2; *see also id.* at 205:12–18 ("I don't know if [Bellanti] took over all of it or how that worked out and I don't know any particularities[.]"). Versfelt, in short, was replaced, in part, by Dussard—who's more than five years *older* than he is.

What's the dispute then? Well, in opposing summary judgment, Versfelt—for the first time—appeared to suggest (in that now-infamous declaration) that everything everyone had said (including himself) about an older chef sharing his former job duties was actually false. Here are the relevant excerpts from that declaration:

> 67. Bellanti, formerly my Executive Sous Chef and nearly five (5) years my junior, took over my job duties and responsibilities as Executive Chef for Defendant instead of formally hiring a replacement for my position.

> 68. Irrespective of the assistance to Bellanti provided by Dussard, Bellanti, in Dussard's absence, handles all job responsibilities and duties required by the Executive Chef, but does so without assuming the formal title.

> 69. I was replaced by a significantly younger employee of Defendant.

Versfelt Decl. ¶¶ 67–69. For three reasons, we don't view this "dispute" as genuine. *First*, in his declaration, Versfelt never explicitly denied that Dussard *also* helped take on the executive-chef role. *Id.* Instead, Versfelt simply said that "Bellanti, in Dussard's absence, handles all job responsibilities." *Id.* ¶ 68. But he never averred that Dussard is ever actually absent—whatever that might mean. In other words, while Versfelt did state that Bellanti "took over [his] job duties," he never denied that Dussard *also* helped fill in the executive-chef role.

*Second*, even if he had averred that Bellanti was the only person to take over his role, we'd conclude that Versfelt's newfound theory is a sham. The law in our Circuit is clear: "[w]hen a party

has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins*, 736 F.2d at 657; *see also Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016) ("The Eleventh Circuit . . . allows a court to disregard an affidavit as a matter of law when, without explanation, it flatly contradicts his or her own prior deposition testimony for the transparent purpose of creating a genuine issue of fact[.]"). And a district court's exclusion of a sham affidavit is reviewed only for "abuse of discretion." *Id.*

In our case, Versfelt gave *clear* answers to *clear* questions at his deposition. He repeatedly testified that, although he'd heard from others that Bellanti "took over [his] role for the most part," he "d[idn't] know if [Bellanti] took over all of it or how that worked out and I don't know any particularities." Versfelt Depo. at 205:13–16; *see also id.* at 204:23 ("Do I know for sure specifically? No, I do not."). In fact, when he was asked "whether Everton [Dussard] also took over" some of his duties, Versfelt responded: "I don't know specifically, but I would imagine he probably would have to some degree. I mean, he was the senior guy. He was the main -- he ran the main kitchen there." *Id.* at 207:5–10; *see also id.* at 212:20–213:2 ("As I said before, I'm sure Everton is helping Joe with that task, and how it may or may not have been divvied up between them or to what level and/or regard that's occurring, I have no knowledge."). To the extent Versfelt now claims that *only* Bellanti took over his position—and that Dussard hasn't helped fill the role *at all*—Versfelt has provided *no* explanation for his sudden reversal. We won't reward a transparent attempt to dodge summary judgment.

*Third*, even if none of this were true, we'd still find that Versfelt failed to make out a *prima facie* case because of what the Eleventh Circuit said in *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788 (11th Cir. 2011). In that case, the district court granted summary judgment, finding that "an older

employee" had become the plaintiff's immediate replacement, "despite [the plaintiff's] contention that he was replaced by . . . a younger employee." *Id.* at 791. The Eleventh Circuit affirmed. In doing so, the court observed that the only evidence the plaintiff adduced for his position that a younger employee had replaced him "was the deposition testimony of UPS' HR manager," which the HR manager walked back during that same deposition. *Id.* at 796. And the older employee "himself testified that he replaced" the plaintiff. *Id.* "[T]he inconsistent testimony of a witness . . . coupled with the consistent testimony of another witness[] is not sufficient to create a genuine issue of material fact." *Id.* Just so here. Versfelt's inconsistent declaration (to the extent it *is* inconsistent) cannot create a genuine issue over the consistent testimony of *at least three other* Sanza employees—all of whom testified, as Versfelt had, that *both* Bellanti *and* Dussard took over Versfelt's job. Because Versfelt was replaced (in part) by an older employee, he's failed to state a *prima facie* case of age discrimination.[11]

### 2.  Legitimate, Non-Discriminatory Reasons

Sanza has identified several legitimate, non-discriminatory reasons for terminating Versfelt. "The defendant's burden is one of production, not persuasion, and is 'exceedingly light.'" *Cotton v. Enmarket Inc.*, 809 F. App'x 723, 725 (11th Cir. 2020) (quoting *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988)). Sanza submits that it terminated Versfelt for three reasons: (1) he "demonstrated poor leadership skills and did not respect others"; (2) he "did not handle external stakeholders well"; and (3) he "did not respond well to constructive criticism." MSJ at 12; *see also* Defendant's SOF ¶ 53. These are sufficient to satisfy Sanza's burden of production. *See, e.g.*, *Thompson v. DeKalb Cnty.*, 2021 WL 5356283, at *6 (11th Cir. Nov. 17, 2021) (finding that an employer presented "legitimate, non-

---

[11] In any event, as we're about to see, Versfelt hasn't rebutted Sanza's legitimate, non-discriminatory reasons for firing him. So, even if he had made out a *prima facie* case, he'd still lose.

discriminatory reasons for [the plaintiff's] termination" by pointing to the plaintiff's "hostile and arrogant" interactions with others); *Kohser v. Protective Life Corp.*, 649 F. App'x 774, 778 (11th Cir. 2016) (holding that an employer met its burden by explaining that it fired the plaintiff "after her subordinates submitted numerous complaints about her management style"); *Rosenfield v. Wellington Leisure Prod., Inc.*, 827 F.2d 1493, 1496 (11th Cir. 1987) (concluding that an employer "carried its burden" by providing evidence that "a client had called . . . to complain about" the plaintiff).

### 3. Pretext

And Versfelt's done nothing to rebut Sanza's legitimate, non-discriminatory reasons. "To avoid summary judgment the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)). "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). "The plaintiff must meet the reason proffered head on and rebut it." *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007). An employee can do this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find all of [the employer's] reasons unworthy of credence." *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (cleaned up). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308.

Versfelt hasn't come close to rebutting *any* of Sanza's legitimate, non-discriminatory reasons for firing him. *First*, the evidence shows that Versfelt was an ineffective leader who failed to give his co-workers the basic level of respect (they felt) they deserved. Sanza's vice president of human resources—Miller—explained that she "began receiving complaints from Sanza staff regarding Versfelt's demeanor relatively quickly after he was hired." Miller Decl. ¶¶ 3–5, 10. Indeed, within three months of Versfelt joining the company, two employees—Bellanti and Russo—visited Miller to express their concerns about Versfelt, told Miller that Versfelt was a "bully," and said that he was "abusive to his staff." *See* Memorandum from Lane Miller (Jan. 18, 2019) at 17. Miller also testified that she "had been advised of [Versfelt's] treatment towards staff" by others at the company. Miller Depo. at 13:4–20. McCaffrey likewise testified that Versfelt was "arrogant," "abrasive," and "condescending," and that Versfelt "showed a basic lack of respect" towards his chefs. *See* McCaffrey Depo. at 44:24–25, 46:1–7. And all of this culminated in an ultimatum to the company, in which ten employees complained that Versfelt had treated his team in a "degrading manner" and called for his "termination." *See* Staff Letter. Are we really prepared to say, in the face of all this, that a company cannot fire an employee who's *this* toxic?

*Second*, there's no genuine dispute that Versfelt failed to properly handle an important external stakeholder. Versfelt himself testified that YOLO "was very important because they had some level of relationship with ownership." Versfelt Depo. at 245:8–15. And yet, on Versfelt's own account, YOLO was "upset with their experience." *Id.* at 246:22–23. Versfelt explained that YOLO's guest chefs "weren't happy that I didn't have time to . . . go along with them and spend all day with them." *Id.* at 245:21–246:11. Versfelt added that they didn't like it when he changed YOLO's menu at the last moment:

28

> I also changed their menu. . . . [W]hat they provided I didn't feel was like -- it wasn't enough stuff or it wasn't -- the quality of one of the dishes seemed very -- didn't seem the right mix to the menu I already had planned[.] They took exception to that as well. So that sort of started them off not being very -- they just felt that -- they didn't like that.

*Id.* at 246:12–23. And YOLO didn't keep its frustrations to itself. As we've recounted, it sent a long email to Sanza, detailing the various "hiccups [the guest chefs] ran into" when they were "working with Chef James Versfelt." Letter from YOLO to Sanza (Jan. 11, 2019). Even at the time, Versfelt recognized that this wasn't good for his future prospects. As he put it: McCaffrey was "pretty upset" about the situation "because that client potentially has future business relations with the team and/or ownership so I guess he was probably not happy with the fact that it might get back to Mr. Viola or something and make him look bad." Versfelt Depo. at 247:1–13. Are we really going to prohibit companies from firing employees who damage the companies' relationships with important external stakeholders?

*Third*, it's undisputed that Versfelt failed to follow directions. *See* Plaintiff's SOF ¶ 39 ("[O]nly once did Defendant reference Plaintiff's unwillingness to follow direction was causing issues[.]"). At his deposition, Versfelt conceded that, at one point, McCaffrey spoke to him about what McCaffrey "felt was a failure to [follow directions] when it came to a sponsor in the building, Hoffman's ice cream." Versfelt Depo. at 235:12–16. Towards the "beginning" of Versfelt's time with the company, McCaffrey told Versfelt that he wanted Hoffman's ice cream to be "featured" over a "local vendor" Versfelt had been using at the arena—principally because the owners of Hoffman's ice cream were "good friends of the" Violas. *Id.* at 236:3–19. "And then, at some point [McCaffrey] brought up, well, you've never -- why do we still have this ice cream? You've never put Hoffman ice cream in." *Id.* at

236:20–22. Nor was Versfelt confused about McCaffrey's reaction to this blatant—and unexplained—insubordination: "[H]e seemed a little ticked off by that," Versfelt admitted. *Id.* at 237:2.[12]

What's perhaps most surprising, though, is that Versfelt never even *mentions* any of Sanza's legitimate, non-discriminatory reasons for terminating him—much less does he meet those reasons "head on and rebut" them. *Crawford*, 482 F.3d at 1308. Instead, Versfelt's discussion of pretext consists almost entirely of these three sentences:

> Here, Defendant proffered no legitimate, nondiscriminatory reason for Plaintiff's termination, but rather, simply stated to Plaintiff that Defendant lost faith in Plaintiff's abilities as a result of his age—absent further explanation. ECF No. 31-1 at 178:10-23; Exhibit A at 62. Any reason for Plaintiff's termination is nothing more than pretext. ECF No. 31-1 at 213:3-9; Exhibit A 64. The sole reason behind Plaintiff's termination was discriminatory animus based on his age. Exhibit A 54, 56-57 and 59.

*See* Response at 8–9. We'll take these sentences—along with some additional authority Versfelt relies on—in turn.

*First*, Versfelt claims that the "Defendant proffered no legitimate, nondiscriminatory reason for Plaintiff's termination, but rather, simply stated to Plaintiff that Defendant lost faith in Plaintiff's abilities as a result of his age—absent further explanation." Response at 8 (citing Versfelt Depo. at 178:10–23 and Versfelt Decl. ¶ 62). But, as we've seen, that's just not true. Indeed, in the very

---

[12] In his statement of facts, Versfelt says that there was no "further recourse or disciplinary action or even memorialization" of the ice-cream incident. Plaintiff's SOF ¶ 39. He also claims that "McCaffrey never informed me at any time that this alleged conduct could lead to discipline." *Id.* But Versfelt never explains why any of this matters. Again, we know of no law that would require an employer, armed with cause (or, as here, many causes) to fire an employee, to discipline that employee first—and Versfelt never suggests that any such law exists. Now, we may be persuaded that an employer would do well, in certain circumstances, to discipline first and fire later, but "[w]e are not in the business of adjudging whether employment decisions are prudent or fair." *Damon*, 196 F.3d at 1361; *see also Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) ("We also stress that we do 'not sit as a super-personnel department that reexamines an entity's business decisions." (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986))).

deposition excerpt Versfelt cites, Versfelt said—*not* that McCaffrey or Miller said *anything* about his age—but that:

> [They j]ust said essentially, you know, management has lost faith in your ability to, you know, operate here as executive chef. Something to that degree. You've lost the -- I don't know what term they used. Not allegiance but sort of the confidence of the staff and, you know, we're going to, you know, terminate your position here.

Versfelt Depo. at 178:16–22. Again, nothing about age. Versfelt, it's true, also cites his declaration, where he claimed: "I was terminated by Defendant, specifically, McCaffrey and Miller, by vaguely alleging that Defendant management lost faith in my abilities due to my age." Versfelt Decl. ¶ 62. But, as we've explained, Versfelt's counsel retracted this statement at a hearing, where he explained that this allegation simply represents Versfelt's "position, his *belief*, those are the reasons that he's being terminated." 2/1/22 Hr'g Tr. at 9:5–8 (emphasis added). At that hearing, in fact, Versfelt's lawyer conceded that neither McCaffrey nor Miller ever suggested that he was being terminated because of his age. *Id.* at 9:15–24 ("[D]uring . . . this termination meeting, no, Judge, I want to make that clear. They -- it is not the plaintiff's position that the defendant walked into the meeting and told them you're too old, experienced, old-fashioned, and you're being terminated because of that. Absolutely not.").[13]

 *Second*, Versfelt contends—without any explanation—that "[a]ny reason for [his] termination is nothing more than pretext." Response (citing Versfelt Depo. at 213:3–9 and Versfelt Decl. ¶ 64). But Versfelt's support for this claim consists *only* of his conclusory statement that he was fired because

---

[13] Even without this clarification from Versfelt's attorney, we'd have reached the same result. In his deposition, after all, Versfelt was clear that he had no recollection of *any* mention of his age at the termination meeting. *See* Versfelt Depo. at 186:25–187:3 ("Q. Did [McCaffrey] or [Miller] mention your age at your termination meeting? A. I don't recall." (cleaned up)). And he can't just make up a new story now—without any explanation—in a flagrant, last-ditch effort to avoid summary judgment. *See Van T. Junkins*, 736 F.2d at 657.

of his age. *See* Versfelt Depo. at 213:3–9 (agreeing with the statement in his complaint that "Defendant's reason for plaintiff's termination was a pretext designed to rid the workplace of an older worker in exchange for a younger, less-qualified employee."); Versfelt Decl. ¶ 64 ("My termination was pretext designed to rid the workplace of an older worker in exchange for a younger, less qualified employee."). But Versfelt's say-so isn't enough. He must offer *evidence* that *each* of the employer's reasons were pretextual—something he's unambiguously failed to do. *See, e.g.*, *Earley*, 907 F.2d at 1081 ("To survive summary judgment, the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice."); *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)).

*Third*, Versfelt claims (again, with no elaboration) that "[t]he sole reason behind Plaintiff's termination was discriminatory animus based on his age." Response at 8 (citing Versfelt Decl. ¶¶ 54, 56–57, 59). But none of the evidence he cites supports this claim. Versfelt's first citation is to a statement from his declaration that, "while there are not direct references to my age in the subject letter, the letter indirectly complains about my 'experienced' approach to handling my subordinates which implicates my age." Versfelt Decl. ¶ 54. Nonsense. As we've seen, the letter never mentions— and never so much as alludes to—Versfelt's age or his experience. *See generally* Staff Letter. What the

letter does say is that "Chef James has been rude, disrespectful, [and] spoken foul to others in a rude or degrading manner." *Id.* Again, the law doesn't prevent employers from terminating employees who treat their subordinates with disdain.

Versfelt's second citation is to the irrelevant proposition—also from his declaration—that he "was never made aware that Defendant was conducting witness interviews connected to the subject letter" and that "[t]here is no memorization [sic] of the subject matter of these interviews or that they even existed." Versfelt Decl. ¶¶ 56–57. We've dealt with this issue already. Suffice it to say here, though, that none of this creates a genuine issue of material fact because the law didn't require Sanza to *discipline* Versfelt, to *warn* him, or even to *tell* him about the complaints. And, in fact, it makes a great deal of sense for an employer to maintain a confidential system for receiving complaints—otherwise, no one would say a word. In any event, as we've explained, whether Sanza talked to these complainants or not, whether it disciplined Versfelt or not, whether it told Versfelt about the complaints or not is totally beside the point. The fact is that ten employees complained to Sanza about Versfelt being a "rude" and "disrespectful" bully. They then concluded their letter with a not-so-subtle ultimatum: fire him or lose us. And nothing Versfelt has said—or, really, could say—precluded Sanza from terminating him on account of that complaint.

Versfelt's third citation in support of his "animus" claim is to *his own* description of his relationship with his staff. As Versfelt recalls those interactions, his subordinates were always "congenial, deferential, respectful, open-minded, and communicative which run[s] in the face of Defendant's misrepresentations." *Id.* ¶ 59. Even taking Versfelt at his word, though, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d

33

1253, 1266 (11th Cir. 2010). In other words, to show pretext, "it is not enough for the plaintiff to show that [his] performance was satisfactory. Rather, [he] must demonstrate that the employer did not believe that [his] performance was lacking, and it merely used that claim as a cover for discriminating against [him] based on [his] age." *Jurriaans v. Ala. Coop. Extension Sys.*, 806 F. App'x 753, 755 (11th Cir. 2020). Versfelt hasn't done that. Just because *he thinks* he treated others well *does not* mean that others felt the same way. Nor does it suggest that McCaffrey—faced with a litany of complaints and an ultimatum from ten employees—was acting pretextually when he concluded that significant leadership issues were plaguing the kitchen.

But here's the rub: even if Versfelt were right that the letter indirectly referenced his age, that Sanza never interviewed the employees who signed the letter, and that McCaffrey couldn't have believed he was a bad manager, he *still* would've succeeded in undermining *only* one of the three legitimate reasons Sanza has advanced—the one involving his leadership style and the way he treated others. Even in that scenario, in other words, Versfelt would have done *nothing* to undermine Sanza's representations that it fired him for failing to properly handle external stakeholders and for insubordination. And it's blackletter law that, "[i]f the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308; *see also Loberger v. Del-Jen, Inc.*, 616 F. App'x 922, 930 (11th Cir. 2015) (same). Having failed to attack *each* legitimate, non-discriminatory reason Sanza proffered, Versfelt's assault on the third reason—standing alone—comes up well short.

*Fourth*, Versfelt relies on *Damon*, a case that does nothing to help him. There, the Eleventh Circuit concluded that, although the plaintiffs *had not* identified direct evidence of discrimination, they *had* adduced enough circumstantial evidence of pretext to proceed to trial. *See* 196 F.3d at 1361. That

conclusion, however, rested on three facts that are entirely absent here. *One*, the panel found "probative" the decision-maker's comment that he wanted "aggressive, *young* men" (like himself) to be promoted "given the substance, context, and timing of [the decision-maker's] comment." *Id.* at 1362. In our case, though, McCaffrey's comments—even if we agreed that they had *anything* to do with age[14]—didn't tie Sanza's employment actions to age, weren't made in the context of personnel decisions, and weren't close in time to the termination of any older employees. McCaffrey's remarks, in other words, are missing the substance, context, and timing the court of appeals found probative in *Damon*. *Two*, the Eleventh Circuit emphasized that, "[w]ithin a one-year period, *four* older, highly experienced store managers, out of a total of *seven* managers under [the decision-maker's] *direct supervision,* were terminated or demoted, and each was replaced by an employee under forty years old." *Id.* at 1361. That *does* sound like compelling evidence of age discrimination. It's also conspicuously missing from our case. *Three*, the plaintiffs in *Damon* offered powerful evidence rebutting each of the employer's proposed legitimate reasons for termination—something our Plaintiff never really even tries to do. *Damon*, then, only underscores how much more Versfelt would've needed to do to meet his burden.[15]

---

[14] Remember, in this regard, that one of these was McCaffrey's perfectly innocuous comment about having *liked* Versfelt's mustache. And the others—about Versfelt being "old-fashioned" or "experienced"—could apply with equal force to a younger person. Alexander the Great, after all, was quite "experienced" in the art of military conquest by his twentieth birthday, and we often colloquially refer to young people who, for example, listen to classical music on the radio, jot down notes with pen on paper, or read physical copies of Will Durant as "old-fashioned."

[15] Versfelt's reliance on *Alphin* fares no better. In that case, the court found sufficient evidence of pretext where (1) the decision-maker "repeatedly suggested that [the plaintiff] resign" and, right after a corrective interview with the plaintiff, called the plaintiff "too old"; (2) the employer had "eliminate[d] another employee . . . within the protected age group"; and (3) the plaintiff had a "history of favorable job evaluations" and presented "testimony . . . that [the employer] disciplined him for offenses which it ignored in others." 940 F.2d at 1499, 1501. In our case, there's no evidence that

Beyond all that, there are a few facts about our case that render Versfelt's claim of age discrimination (in a word) implausible. As an initial matter, McCaffrey hired—and fired—Versfelt within a seven-month period. *See* Defendant's SOF ¶¶ 5, 54–55; Plaintiff's SOF ¶¶ 5, 54–55 (not disputing this fact). And Versfelt agreed that McCaffrey knew how old he was *before* he hired him. Defendant's SOF ¶ 7 ("At the time McCaffrey hired Plaintiff, McCaffrey did not know Plaintiff's age."); Plaintiff's SOF ¶ 7 ("Disputed. McCaffrey . . . reviewed his resume with him *ad nauseum* during multiple interviews, pre-employment," and that resumé had "clear indicators of Plaintiff's age[.]"). It strains reason to suppose that McCaffrey—fully content to hire a 53-year-old seven months earlier— suddenly and inexplicably developed an antipathy towards men in their fifties. As the Eleventh Circuit has pointed out: "An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification." *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (quoting *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995)); *see also Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 837 (11th Cir. 2015) ("[T]he fact that [the employer] hired [the plaintiff] only a year before her discharge undermines the notion that any of his actions toward her were gender-motivated.").

What's worse, there's no dispute that, of the 54 people who reported to Versfelt, 20 of them (nearly 40%) were Versfelt's age *or older*. Defendant's SOF ¶¶ 77–78; Plaintiff's SOF ¶¶ 77–78 ("Undisputed."). There's no dispute, either, that Versfelt got the executive-chef job over Bellanti, the *younger* applicant, *see* Bellanti Depo. at 17:8–19, and that McCaffrey had encouraged Dussard—who's

---

McCaffrey commented on Versfelt's age "right after" any disciplinary measure, that Sanza fired other employees over the age of 40, or that Versfelt received positive evaluations and inconsistent treatment.

even *older* than Versfelt—to apply for the job, *see* Defendant's SOF ¶¶ 15–16; Plaintiff's SOF ¶¶ 15–16 ("Undisputed."). Versfelt, then, would have us believe that he's the *only* person McCaffrey has subjected to age discrimination. Given the facts, though, *that* suggestion—flimsy even in the abstract—makes little sense. *See, e.g.*, *Mitchell v. City of LaFayette*, 504 F. App'x 867, 871 (11th Cir. 2013) (finding no genuine issue of "discriminatory intent in light of the fact that the City also retained other employees who were well over the age of 40 in those departments, and many of the employees retained were older than [the plaintiffs]").

The truth is that Versfelt (very likely) finds none of this surprising. He, after all, understood that he was fired for reasons having nothing to do with his age. One "factor" he pointed to was his tumultuous "relation[ship] with the owner's wife." Versfelt Depo. at 193:12–13. He explained that, after his quarrel with Ms. Viola—in which she told him that things just weren't "working out"—"I remember, you know, being pretty -- like, that's not a good thing to happen within that building. She's had people fired before, I had heard, for other types of things that displeased her." *Id.* at 195:17–22. A second factor Versfelt pointed to was his salary. He testified that it's "[o]ne hundred percent" possible that his "higher salary" and "the financials of Sanza might have had something to do for the reason" he was let go. *Id.* at 203:10–24. We agree—and no reasonable jury could conclude otherwise.

*       *       *

Versfelt hasn't made out a *prima facie* case of age discrimination. And, even if he had, he hasn't rebutted his employer's legitimate, non-discriminatory reasons for firing him.

### CONCLUSION

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1.  Sanza's Motion for Summary Judgment [ECF No. 29] is **GRANTED**.

2. Pursuant to Fed. R. Civ. P. 58, we'll enter final judgment separately.

3. The Clerk of Court shall **CLOSE** this case.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 15th day of February 2022.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record